IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANITA D. PERKINS,

     Plaintiff,

                                      6:13-cv-00985-PK

                                      FINDINGS AND

v.                                  RECOMMENDATION

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

PAPAK, Magistrate Judge:

     Plaintiff Anita D. Perkins filed this action on June 13, 2013, seeking judicial review of

the Commissioner of Social Security's final decision denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act ("the Act").  This court has jurisdiction over Perkins's action pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3).

     Perkins argues that by erroneously rejecting medical evidence, failing to consider

relevant medical evidence, and erroneously rejecting Perkins's testimony regarding the extent of

Page 1 -- FINDINGS AND RECOMMENDATION

her impairments, the Commissioner of Social Security ("Commissioner") failed properly to assess Perkins's residual functional capacity ("RFC"). I have considered the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILTY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work

activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482

U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§

404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's

impairments are not severe or do not meet the duration requirement, the claimant will be found

not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c),

416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a

de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273,

1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of

impairments can be found 'not severe' only if the evidence establishes a slight abnormality that

has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* SSR 85-28,

1985 WL 56856, at *3 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at

which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one

of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will

conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments,

between the third and the fourth steps the ALJ is required to assess the claimant's RFC, based on

all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§

404.1520(e), 416.920(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566,

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

The court reviews the Commissioner's decision to ensure that the ALJ applied the proper legal standards and his or her findings were supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," *Lingenfelter*, 504 F.3d at 1035, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998), but it may not substitute its own judgment for that of the Commissioner.  *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  Furthermore, the court may not rely upon its own independent findings of fact to determine whether the ALJ's findings are supported by substantial evidence.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  The Commissioner's findings must be affirmed, provided they are supported by substantial evidence in the record, if the ALJ rationally interpreted the evidence, even if the evidence is "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984); *see also Jamerson v. Charter*, 112 F.3d 1064,

1067 (9th Cir. 1997) ("[T]he key question is not whether there is substantial evidence that could

support a finding of disability, but whether there is substantial evidence to support the

Commissioner's actual finding that claimant is not disabled."). "Where 'the evidence can

reasonably support either affirming or reversing a decision, we may not substitute our judgment

for that of the [ALJ]." *Garrison v. Colvin*, No. 12-15103, 2014 WL 3397218, at *11, *23 (9th

Cir. July 14, 2014), *citing Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

## SUMMARY OF ADMINISTRATIVE RECORD

Perkins was born on July 22, 1968. Tr. 217. She earned a Bachelor's degree in 1990. Tr.

242, and completed a yoga instructor's training course in 2007, Tr. 58, 242. According to

evidence in the record, prior to her claimed disability onset date of August 1, 2003, Perkins had

numerous part-time and full-time jobs. Tr. 261. By her own estimate, Perkins has held more

than fifty jobs over her twenty-eight year work history, although she was also unemployed for

"quite a bit of time" during this period. Tr. 83.

From April 2002 through June 2003, Perkins worked on a part-time basis as a self-

employed yoga instructor. Tr. 261-262. Prior to that, she worked full-time as a director of

membership services for a nonprofit trade organization from December 2001 through February

2002. Tr. 261, 263. From May 2000 through October 2001, Perkins was employed as a design

coordinator for a residential construction company, initially working part-time but subsequently

being promoted to full-time. Tr. 261, 264. Through a temporary staffing agency, she was

contracted to work as an administrative assistant at various companies from May 1999 through

May 2000, typically working on a part-time basis. Tr. 261, 265. From October 1997 through

March 1999, Perkins was a part-time bookstore sales clerk. Tr. 261, 266. In July 1997, she was

hired as a part-time software customer service representative. She was promoted to full-time,

holding this position through September 1997. Tr. 261, 267. Perkins also worked as an office assistant from September 1996 through April 1997, a childcare worker at a residential facility from September 1991 through April 1992, an advertising assistant for a book wholesaler from January 1991 through July 1991, and, while in college, as an office product sales clerk from February 1988 through approximately June 1988. Tr. 261. The record does not indicate whether these positions were part- or full-time.

Since her claimed disability onset date, Perkins has worked exclusively as a self-employed yoga instructor, though her earning records indicate income only for 2007 ($1483.00) and 2008 ($2019.38). Tr. 58, 234. By 2007, she reported that she had "worked up to teaching what would be called full time in the yoga world . . . teaching 10 to 12 classes a week, plus doing my own marketing[ and] computer work." Tr. 58. At this time, she was working an average of "at least 30 hours a week." Tr. 58. This "lasted for about five months" before she began "dropping the ball and not answering emails and . . . cancelling classes at the last minute." Tr. 59. She reported "[t]hat's kind of when the fibromyalgia came in and . . . my whole body was hurting, like, all the time." Tr. 59. By the middle of 2007, Perkins said she was experiencing "a lot of exhausti[on], a lot of what we call mixed mania: agitation with depression . . . and I just fell apart." As a result, she "basically[] just cancelled all my classes, quit completely, and [] didn't work for a year." Tr. 60.

The earliest documentation in the administrative record of Perkins's mental impairment is a treatment note from David Dove, N.D., dated April 20, 2005, in which Dr. Dove diagnosed Perkins with bipolar disorder, insomnia, and fatigue. Tr. 337, 19. In a later treatment note dated April 19, 2007, Dr. Dove indicated that Perkins complained of "burning pain" and he diagnosed her with myalgia, the first time Perkins's physical impairment is referenced in the administrative

record. Tr. 326, 19. Dr. Dove continued to treat Perkins through September 2008. Tr. 318.

In August 2007, Perkins began seeing a primary care physician, Pamela Wible, M.D., "to get help with her chronic health issues." Tr. 390. At their first appointment, Dr. Wible recommended that Perkins treat her fibromyalgia pain by "avoid[ing] sugar and dairy." Tr. 391. Shortly thereafter, Dr. Wible's August 29, 2007 treatment notes explain that Perkins's fibromyalgia was "in remission post dietary and lifestyle changes." Tr. 390. Two months later, on October 17, 2007, Dr. Wible again noted that Perkins's fibromyalgia was "improving with diet/lifestyle change." Tr. 389. Dr. Wible continued treating Perkins through March 2, 2010, though her treatment notes make no further reference to Perkins's fibromyalgia. Tr. 384.

In October 2007, Perkins began receiving chiropractic care from Nancy Colfer, D.C. Tr. 393. Perkins saw Dr. Colfer at least sixteen times "for episodes of musculoskeletal pain affecting the low back/pelvis and/or neck/upper back regions" between October 2007 and February 2010.[2] Tr. 395, 396-403. On March 5, 2010, Dr. Colfer opined that:

> Ms[.] Perkins['s] health issues make it difficult for her to reliably predict her function level from day to day, and therefore to maintain employment. Some days she can "sit, stand, walk, lift, carry, etc." but then at other times this is problematic due to pain, fatigue and/or anxiety. On good days, in general, it would be best if she could vary her position frequently (every 20-30 minutes) so as not to exacerbate her myofascial problems. Lifting or carrying more than 10 lbs[.] is likely to cause flare up pain. . . . [Also] her concentration is greatly affected when she is having an anxiety episode. At such times, I have also observed her to have increased myofascial signs and symptoms.

Tr. 395.

On October 22, 2008, Perkins began seeing Lisa Walker, M.D., at Willamette Valley Psychiatric Medicine ("WVPM") for mental health counseling. Tr. 381. Perkins reported to Dr. Walker that she had a history of "anxiety, insomnia, and chronic pain with fibromyalgia," among

---

[2] On January 29, 2010, Perkins received treatment from Dr. Colfer from injuries she sustained while "participat[ing] in an Aikido class and . . . doing some overhead maneuver with a twist to the right to throw her opponent." Tr. 397.

other health concerns not at issue here. Tr. 381. Dr. Walker's treatment notes do not mention

fibromyalgia subsequent to Perkins's self-report at her initial counseling session. Tr. 361-381.

However, the treatment notes do indicate that Dr. Walker was treating Perkins for her bipolar

disorder and other mental health issues. Tr. 361-381. Perkins continued to see Dr. Walker until

she left WVPM in October 2009. Consequently, Perkins's final appointment at WVPM was with

Karen Crocker-Wensel, M.D., on November 23, 2009. Tr. 359. Dr. Crocker-Wensel's treatment

notes indicate that Perkins had gone "2 yr w/o [] total body pain, suspected fibromyalgia – now

resolved." Tr. 359.

Before leaving WVPM, Dr. Walker referred Perkins to Matthew Fleischman, Ph.D., for a

psychological evaluation. Tr. 350. Dr. Fleischman examined Perkins on July 1, 2009, "to

determine if [Perkins] ha[d] an attention deficit disorder" and to address Perkins's concerns about

"mood swings, depression, agitation, irritability, insomnia, and hypersensitivity to stimuli." Tr.

350. Dr. Fleischman observed that Perkins "has had problems with daydreaming, staying on

task, being organized, her mind wandering, getting bored, rarely being 'present' and rarely

finishing what she is doing." Tr. 351. After performing several diagnostic assessments, he

opined that Perkins's "overall level of problems is high" and diagnosed her with adult attention

deficit/hyperactivity disorder ("ADHD"), anxiety disorder not otherwise specified, depression

not otherwise specified, insomnia, and a pain disorder secondary to injury. Tr. 355. Dr.

Fleischman rated Perkins at fifty out of one hundred on the Global Assessment of Functioning

("GAF") scale. Tr. 355. His report concluded with one and a half pages of "treatment

recommendations." Tr. 355-356. These recommendations included: (1) a general explanation of

how attention deficit disorders affect the brain; (2) a suggestion that Perkins "discuss a trial of a

stimulant medication with Dr. Walker;" (3) a statement that neurobiofeedback may also be used

to treat attention problems and a brief explanation of these treatments; (4) a statement of Dr.

Fleischman's "strong belief that ADD/ADHD are not truly 'disabilities'" and that "[w]ith adults,

the best approach [to treating ADHD] is to work within a 'coaching' model of therapy;" (5) a

brief explanation of cranial electrotherapy stimulation; and (6) a statement that "mood, attention

and sleep can all be significantly improved by behavioral changes" including modifications to

one's sleeping environment, engaging in aerobic activity at least three times per week, increasing

protein consumption at breakfast and lunch, and increasing omega-3 consumption. Tr. 355-356.

On February 1, 2010, Perkins protectively filed for DIB.[3] Tr. 108. She protectively filed

for SSI on February 5, 2010. Tr. 123. She alleged a disability onset date of August 1, 2003, Tr.

219, claiming that she was impaired by fibromyalgia, bipolar disorder, ADHD, and depression,

Tr. 241. In her application for benefits, Perkins described herself as highly susceptible to stress:

"I freak out at small things, have panic attacks, have bipolar episodes, and have fibromyalgia

pain flares, all from mild/moderate stress." Tr. 275. She indicated that her fibromyalgia affected

her ability to lift, bend, stand, reach, walk, sit, kneel, and climb stairs. Tr. 274. She reported that

her "[b]ipolar disorder and . . . medications affect my memory, concentration, and ability to get

along with others," Tr. 274, and cause her to have trouble getting out of bed, Tr. 269, because

they make her feel "groggy and dopey," Tr. 270. But without her medication she reported having

trouble sleeping because "I am anxious and agitated and my mind races." Tr. 270. She further

claimed that ADHD affected her ability to complete tasks. Tr. 274.

Perkins reported that her daily activities included taking her medication, stretching, using

the computer, picking up her seven-year-old daughter from school,[4] and preparing simple snacks

---

[3] Perkins previously had been denied DIB benefits on November 4, 2004. Tr. 236.
[4] Perkins explained that she had shared custody of her daughter, caring for her after school and on Saturdays. Tr. 270.

and dinners for her daughter and nineteen-year-old son.[5]  Tr. 269.  Perkins also reported that she

was able to wash dishes for ten minutes per day and do the laundry, which took about one hour

per week.  Tr. 271.  Furthermore, she reported spending much of her time on the computer: "I'm

obsessed with [it], stay on for hours 'til my wrists hurt."  Tr. 273.  She claimed to be unable to

vacuum, due to shoulder and upper back pain, or do yard work, due to pain flares and fatigue

caused by her fibromyalgia.  Tr. 271.  She additionally claimed that "[t]he pain/fatigue of

fibromyalgia worsens when I lift heavy items or reach overhead or kneel or bend or stand or sit

or walk too long," Tr. 274, and that her pain was also triggered by cold weather, Tr. 271.

Moreover, her fibromyalgia caused her to become fatigued after walking three-quarters of a mile.

Tr. 274.  She claimed to leave the house rarely, "usually only go[ing] out for weekly groceries,

necessary errands, and picking up kids at school."  Tr. 271.  Perkins also described being

"[a]fraid to leave the house," Tr. 275, because she experienced panic attacks and social anxiety,

Tr. 271, and she tried to avoid people because she was volatile and moody, Tr. 273.

      Perkins's former spouse, Albert Perkins ("Albert"), submitted a third party function report

to the Commissioner.  Tr. 253-260.  Albert indicated that Perkins "sleeps very badly" and was

"[o]ften tired all day and [takes] a cocktail of pills that never seem to work well."  Tr. 254.  He

explained that Perkins was "not usually feeling fit enough to do housework.  Her son does all of

the yard work," Tr. 255, and that all of Perkins's "physical activities are affected by the pain and

fatigue of Fibromyalia."  Tr. 258.  Albert claimed that "since I've known her she has been

gradually getting more volatile, moody, depressive, and anxious."  Tr. 257.

      On April 5, 2010, Ryan Scott, Ph.D., evaluated Perkins for "issues of depression, bipolar

---

[5]  By the time of Perkins's hearing before the ALJ, her son had moved into a foster home for
adults with disabilities.  Tr. 49.

disorder, ADHD, and fibromyalgia" at the request of Disability Determination Services.[6] Tr.

431. Consistent with her disability application, Perkins reported to Dr. Scott that she felt

depressed and had chronic neck, shoulder, back, and knee pain. She further explained that she

spent a lot of time on the computer and reading; relied on her son to help with household chores,

did laundry once per week; could not vacuum, garden, or do yard work; had some trouble

walking due to fibromyalgia; rarely left home; could drive but found it to be "anxiety

provoking;" had difficulty being around other people; and her sleep habits varied with her mental

status. Tr. 433. Dr. Scott noted that Perkins "appeared quite nervous" during her appointment

and "had a tendency to be tangential" but she "appeared alert and oriented to time, person, place,

and situation" and her thought processes were "still relatively on task." Tr. 433. He opined that

Perkins "appears to meet the criteria for bipolar spectrum disorder," Tr. 435, with occasional

psychotic features, though Perkins reported that these features had "largely desisted since she has

been on lithium," Tr. 433. Dr. Scott did not evaluate Perkin's fibromyalgia or any physical issues

because that was "beyond the scope of []his evaluation,"[7] Tr. 435, but described Perkins's other

impairments as follows:

> Perkins'[s] bipolar and ADHD have caused significant impairment in her ability to do
> work tasks in the past and maintain steady employment. Her psychological issues would
> likely be a significant distractor to those around her and substantially interfere with her
> ability to complete work tasks in a timely manner. Mental status testing suggests that she
> would have the cognitive abilities to perform work tasks if not impaired by physical or
> mental health issues.

Tr. 435.

On April 15, 2010, Perkins was examined by consultative examining physician DeWayde

---

[6] As part of this evaluation, Dr. Scott consulted Dr. Fleischman's July 1, 2009 report and WVPM
treatment notes from August 13, 2009 through November 23, 2009. Tr. 432.
[7] Dr. Scott also noted that "[e]valuating ADHD is also beyond the scope of this evaluation . . .
However, based on a review of background records . . . She will be diagnosed with ADHD by
history." Tr. 435.

Perry, M.D. Tr. 441. Dr. Perry reported that Perkins appeared to "sit[] comfortably during the examination. She did not have difficulty getting on or off the examination table." Tr. 442. Dr. Perry's found that Perkins could "ambulate without an assistive device," "demonstrated normal motor strength in all extremities," and had "no observed deficits in her coordination or fine/gross motor skills." Tr. 442-444. But he also found that Perkins had "eleven posterior trigger points and three anterior trigger points that were positive for fibromyalgia." Tr. 444. He opined that it was "possible" that Perkins had fibromyalgia and suggested that she observe the following limitations: (1) stand or walk for a maximum of six hours per eight-hour work day, (2) lift and carry no more than ten pounds frequently and twenty pounds occasionally, (3) frequently change postural activities, and (4) only occasionally reach. Dr. Perry further opined that Perkins was not limited in her ability to sit and could work at heights, with heavy machinery, or with exposure to extreme temperatures, chemicals, dust, fumes, gases, or excessive noise. Tr. 444-445.

Four days later, on April 19, 2010, Dr. Wible authored a short letter to Lane County Senior & Disabled Services that stated, in full:

> I am writing in regard to Anita Perkins (DOB 7/22/1968) whom I have been caring for since August 2007. She suffers from fibromyalgia, bipolar disorder, insomnia and ADHD. She has been hospitalized in the past due to a psychotic break and is currently stabilized on her medications and without treatment her condition would be life threatening.

Tr. 446.

Perkins's DIB and SSI claims were denied initially on May 25, 2010, Tr. 109-122, 123-139, and again upon reconsideration on September 21, 2010,[8] Tr. 141-151, 152-168. On September 24, 2010, Perkins filed a written request for a hearing before an ALJ. Tr. 193-194. Prior to this hearing, treatment notes from Elizabeth Churchill, PMHNP, were added to the

---

[8] The ALJ mistakenly indicates in his decision that Perkins's applications were denied on May 26, 2010, and September 22, 2010. Tr. 13.

record.[9]  Tr. 538-557.  Perkins saw Dr. Churchill from July 8, 2010, through March 19, 2012,

primarily for medication management.  Tr. 538-557.  Over the course of her treatment with Dr.

Churchill, Perkins was "generally doing well" and "not having significant side effects" from her

medication.  Tr. 542.[10]  However, on November 8, 2010, Perkins reported to Dr. Churchill that

"she [was] not doing well and [the winter was] a hard time of year for her."  Tr. 550.  Dr.

Churchill adjusted Perkins's medication and by her next appointment on December 6, 2010,

Perkins had returned to feeling "generally stable on [her then-]current medication regimen."  Tr.

549.

       On May 10, 2012, Perkins's appeal was heard before an ALJ.  Tr. 42-107.  She was

represented by counsel at the hearing and testified that "both illnesses, mental and physical, are

triggered by excess stress . . . they both prevent me from working too many hours . . . and they

both require me to do a lot of self-care."  Tr. 68-69.  Perkins explained that, at the time of the

hearing, on average, she was teaching "one to two [yoga] classes a day, about four days a week,"

but when she was depressed she "might teach one or two classes a week."  Tr. 65.  She further

explained that she mainly taught private lessons because they were less stressful, but would

occasionally teach group classes.  Tr. 63.  She testified that her current schedule was

"manageable," Tr. 63, but she had not been able to "hold it together" when she worked full-time.

Tr. 56-57.  She attributed her inability to maintain steady or full-time employment to the effects

---

[9]  Dr. Churchill, however, declined to submit an opinion for the Commissioner's consideration.
Tr. 21, 104.
[10]  *See also* Dr. Churchill's reports on March 19, 2012, that Perkins "says she is generally doing
well.  She is not having significant ups and downs and is taking her medications as prescribed,"
Tr. 539; on March 7, 2011, that Perkins "says she is doing fairly well," Tr. 547; on January 10,
2011, that Perkins "is not having any problems with her medications and generally mood is
stable," Tr. 548; on December 6, 2010, that Perkins is "generally stable on current medication
regimen," Tr. 549; on September 20, 2010, that Perkins was "generally doing well" and was
"currently stable on medications," Tr. 552; and on July 27, 2010, that Perkins "reports that she is
generally stable on her medications," Tr. 553.

Page 14 – FINDINGS AND RECOMMENDATION

of her bipolar disorder, which "reduces my ability to handle stress" and resulted in her frequently

quitting jobs. Tr. 83. Perkins explained that she became a yoga instructor because it was "very

low stress and manageable and [would] allow [her] to do [her] self-care." Tr. 58. Additionally,

she claimed that her "mood and . . . ability to function varies from week to week," but being self-

employed had allowed her to tailor her work schedule to the "daily ups and downs" of her

physical and mental needs. Tr. 63. She further reported not working "in the depth of winter,"

due to seasonal depression, or "in the height of summer," due to "seasonal hypomania." Tr. 63-

64. However, when asked by the ALJ, Perkins admitted that she had never consulted a

vocational expert in an effort to find other work she might be able to perform on a full-time

basis. Tr. 78. She responded that she did not believe her inability to work full-time was caused

by "the type of work." Tr. 78. She testified to her belief that "it's the number of hours that's the

issue." Tr. 78.

Perkins testified that she managed her symptoms by taking daily medication and dietary

supplements and spending time stretching gently and relaxing. Tr. 61. To treat her physical

pain, she reported taking Aleve and Advil, using a heating pad, soaking in a hot tub, and relaxing

with breathing, exercises, and resting. Tr. 71. She also reported taking sleeping medication "in

order to get a good night's sleep because that helps prevent or alleviate as needed the pain

symptoms and keep[s] me mentally stable." Tr. 80. She explained that her pain flares usually

happened:

> in the morning, but it can last all day. I'll wake up and it feels like my whole body
> has this, like, burning pain and it's not in any one place. It's like, everywhere, but
> mostly neck, shoulders, upper back, some down through hips or lower back and
> it's like everything hurts and I feel really tired.

Tr. 70. She reported, however, that her fibromyalgia symptoms "have mostly been in remission"

since she reduced her work schedule. Tr. 69. But Perkins also reported that she is nevertheless

Page 15 – FINDINGS AND RECOMMENDATION

prone to experiencing symptoms when "[t]here is a buildup over time of stress" and work responsibilities, Tr. 77, although she reported that working part-time helped with her depression, Tr. 64. During the past few years, she explained, her pain had "been pretty good, but [when] I've had times when I've had pain flares . . . chiropractic helps me a lot and pain medication helps me a lot." Tr. 70. When asked, Perkins agreed with the ALJ's statement that "assuming some other stress doesn't come up" Perkins could pretty much control her pain symptoms through her current measures, Tr. 72.

To treat her bipolar disorder, Perkins reported using prescribed lithium, Seroquel, Klonopin, and Prozac. Tr. 72. She explained that typically her "depression hits by the end of October or early November," Tr. 75, and in the winter she gets suicidal, Tr. 64. She explained that "medication and self-care reduce the frequency and severity of both my manic and depressive episodes. However, they do still happen and they are still disabling." Tr. 87. Perkins also reported experiencing some side effects from her medication, including hand tremors, slight dehydration, fatigue, mental confusion, and apathy. Tr. 95-96.

The ALJ issued his opinion on May 29, 2012, finding Perkins not disabled under the Act. Tr. 10-28. At the first step of the five-step sequential process, the ALJ found that Perkins had not engaged in substantial gainful activity since her claimed disability onset date of August 1, 2003, finding that the "claimant's work as a yoga instructor is not considered substantial gainful activity." Tr. 15. At step two, the ALJ determined that Perkins had the following severe impairments: bipolar disorder, ADHD, and fibromyalgia. Tr. 16. The ALJ noted that Perkins had previously received various affective and anxiety disorder diagnoses, but the "recent psychological consultative examiner and other mental health treatment sources seem to favor bipolar disorder and ADHD as the primary basis for the claimant's mental symptoms." Tr. 16.

At the third step, the ALJ found that none of Perkins's impairments, alone or in combination, was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 16. The ALJ then assessed Perkins's RFC. He concluded that Perkins had the capacity to perform light work provided she not stand or walk for more than about six hours in an eight-hour workday and she only occasionally climb ladders, ropes, or scaffolds. Tr. 18. In addition, the ALJ found that Perkins would have difficulty staying focused on lengthy tasks and would be distracted she was if required to work in close proximity to a large group of people. Tr. 18. At step four, the ALJ concluded that Perkins was capable of performing past relevant work, including her previous jobs as a clerical worker and sale/designs coordinator for new home sales development. Tr. 22. The ALJ therefore found that Perkins was not disabled under the Act. Tr. 22.

Perkins appealed the ALJ's decision. Tr. 6. On April 9, 2013, the Appeals Council denied Perkin's request for review of her case, Tr. 1, making the ALJ's May 29, 2010, decision the final agency decision. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## DISCUSSION

Perkins challenges the Commissioner's assessment of her residual functional capacity. She argues that the ALJ erred by discrediting her impairment testimony on the grounds that it was unsubstantiated by the medical record. She argues that the ALJ improperly considered the opinions of Drs. Wible, Fleischman, and Scott, erroneously rejecting the elements of these doctors' opinions that substantiated her claims regarding the extent of her impairments. She also argues that the ALJ committed harmful error in neglecting to consider the "other source" opinion of Dr. Colfer. *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Finally, she asserts

that the erroneously rejected evidence should be credited and the court should grant her an immediate award of benefits based on the existing administrative record.

## I.    Credibility of Perkins's Pain and Symptom Testimony

When a claimant has produced objective medical evidence that could reasonably be expected to cause the alleged symptoms, and there is no affirmative evidence of malingering, "the ALJ may reject the claimant's testimony regarding the severity of [the claimant's] symptoms only if he [or she] makes specific findings stating clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1284, *citing Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 2014 WL 3397218, at *16, *quoting Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002). Accordingly, the ALJ's reasoning must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1991) (*en banc*). To be sufficiently specific "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). A general assertion that the claimant is not credible is insufficient. *Smolen*, 80 F.3d at 1284. The ALJ's decision to discredit the claimant's testimony must be based on substantial evidence. *Reddick*, 157 F.3d at 720, *citing Smolen*, 80 F.3d at 1279. But if the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas*, 278 F.3d at 959, *citing Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The ALJ found Perkins's pain and symptom testimony to be partly credible. He found

that Perkins's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible." Tr. 19. As discussed above, Perkins alleged that fibromyalgia, bipolar disorder, ADHD, and depression prevented her from working full-time,[11] although she "continued to work [part-time]." Tr. 18. Perkins claimed that at most she could work "a constant 15 to 20 hours a week at a low stress job." Tr. 84. She testified that she had several past "experiences trying to hold together a full time job and not being able to" because of stress and anxiety. Tr. 58. She further testified that she began teaching yoga classes because she thought "that would be very low stress and manageable and allow me to do my self-care," Tr. 58, but her anxiety returned and she began to experience fibromyalgia pain when her teaching schedule increased to thirty hours per week, Tr. 59.

The ALJ found Perkins to be "very sincere and generally credible in describing her belief that her current low-demand lifestyle . . . allows her to maintain stability for both her fibromyalgia and mental impairments." Tr. 19. However, Perkins's former primary care physician, Dr. Wible, opined that Perkins's "fibromyalgia pain was controlled after 'dietary and lifestyle changes.'" Tr. 19, *quoting* Tr. 390. And despite Perkins's "long history of bipolar disorder," Tr. 19, according to her former treating physician, Dr. Dove, her "mood disorder [i.e., bipolar disorder] was characterized as 'now stable' on medication," Tr. 19, 329. Additionally, Dr. Churchill, Perkins's mental health provider, described her as "generally doing well," Tr. 542, and "not having significant ups and downs," Tr. 539. The ALJ also explained that "[t]he record does not contain any medical records contemporaneous to the alleged onset date. The earliest available records are from April 2005 and document . . . bipolar disorder, fatigue, and insomnia

---

[11] The ALJ noted that on Perkins's application for benefits she "denied that her impairments had caused her to make changes in her work activity." Tr. 242.

. . . The claimant's myalgia pain is documented as early as April 2007." Tr. 19.

The ALJ found that Perkins's testimony was further contradicted by the following medical evidence: (1) Dr. Fleischman's opinion that Perkins's mental condition would improve with treatment and medication, Tr. 20; (2) Dr. Walker's opinion that Perkins's mental condition had improved when she regularly took her medication, Tr. 20; (3) Dr. Scott's clinical assessment, which was supportive of "the conclusion that the claimant can perform at least some basic work activities, provided they accommodate her problems with concentration and appropriate social interaction" Tr. 20; (4) Dr. Perry's opinion that Perkins's physical pain did not prevent her from working full-time; and (5) the state agency psychological consultants who opined that Perkins "could complete a normal workday or workweek by taking scheduled rest periods," Tr. 21, 135. Additionally, the ALJ found that Perkins's work as a yoga instructor "demonstrates that the claimant remains able to perform at least some basic work activities in spite of her alleged impairments." Tr. 15.

Perkins argues that it "does not make any sense" that the ALJ "finds Plaintiff credible but finds that the medical opinions of record do not support her contentions." Pl.'s Opening Br. 18. Perkins explains that her "main complaint. . . is that due to a combination of physical and mental impairments, she cannot work more than 20 hours per week. The[]ALJ has not given any reason to discredit Plaintiff's main complaint." Pl.'s Opening Br. 18. Perkins also argues that "the ALJ impermissibly assum[ed] the role of doctor" in concluding that Perkins's mental impairments could be controlled by medication based on evidence from "two different combinations of medication noted in . . . two different [medical treatment] notes." Pl.'s Opening Br. 18. Perkins contends that her "medications and the affects that had on her ability to function were an ongoing process," and although she had stabilized she remained incapable of engaging in full-time work.

Pl.'s Opening Br. 19.

The ALJ provided clear and convincing reasons for partially discrediting Perkins's pain and symptom testimony. The ALJ credited Perkins's testimony to the extent that he believed Perkins's assertions that her current low-stress work schedule permitted her to effectively treat her physical and mental impairments. It is therefore only the ALJ's determination that Perkins was not credible in her assertion that she was incapable of engaging in full-time work that is at issue here. The ALJ reached this conclusion by determining that Perkins's symptoms were treatable, had been previously managed through medication and treatment, had stabilized, and did not fluctuate to the extent alleged. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled by medication are not disabling for the purpose of determining eligibility for SSI benefits.").

The ALJ's findings were supported by substantial evidence in the record. Dr. Wible – Perkins's treating physician from August 2007 to March 2010 – opined that Perkins was able to effectively treat her fibromyalgia through diet and lifestyle choices, Tr. 390, and her mental condition was "stabilized on medication," Tr. 446. Dr. Walker – Perkins's mental health provider from October 2008 through October 2009 – opined that Perkins was "generally doing well," Tr. 542, and her mental condition was not generally susceptible to unusual daily fluctuation, Tr. 539. Dr. Fleischman opined that Perkins's mental impairments were treatable through a variety of potential treatment options. Tr. 355-356. In addition, Dr. Perry opined that Perkins's physical disabilities did not prevent her from working full-time, Tr. 444-445, and the state agency psychological consultants affirmed that Perkins's mental impairments did not prevent her from engaging in full-time work, Tr. 135. Furthermore, Perkins's employment as a yoga instructor and her personal daily yoga practice are supportive of the ALJ's finding that Perkins's physical

impairments did not prevent her from engaging in basic work activities. The ALJs conclusion was thus based on substantial clear and convincing evidence in the record; this court may not therefore overturn the ALJ's findings.

Turning to Perkins's assertion that the ALJ improperly "assum[ed] the role of doctor," Pl.'s Opening Br. 18, I find that it is unpersuasive. To reach his conclusion that Perkins's conditions were treatable, the ALJ did not speculate as to what Drs. Wible, Walker, or Fleischman were "probably referring to." *See Ratto v. Sec., Dep't. of Health & Human Servs.*, 839 F.Supp. 1415, 1427 (D.Or. 1993). To the contrary, as discussed above, their opinions that Perkins's condition was treatable with medication were clearly documented in the record. Neither does Perkins point to any evidence that the ALJ went "outside the record to medical textbooks for the purpose of making his own exploration and assessment as to claimant's . . . condition." *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975), *citing Williams v. Richardson*, 458 F.2d 991, 992 (5th Cir. 1972). To the extent that Perkins suggests that evidence in the record contradicts the ALJ's finding on this matter, it is the ALJ's responsibility to "determin[e] credibility and resolv[e] conflicts in the medical testimony." *Magallanes*, 881 F.2d at 750, *citing Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's decision cannot be overturned on the basis that the evidence is "susceptible [of] more than one rational interpretation." *Id.*, *citing Gallant*, 753 F.2d at 1453.

I acknowledge that the validity of the ALJ's credibility determination with regard to Perkins's testimony raises a close question. Nevertheless, I find that the ALJ provided clear and convincing reasons for partially discrediting Perkins's testimony that were based on substantial medical evidence supportive of the conclusions that Perkins's condition was treatable with medication, had stabilized, and her symptoms did not fluctuate to such an extent as to preclude

gainful employment. I therefore cannot conclude that the ALJ's interpretation of the evidence was irrational. See *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). Accordingly, the ALJ's credibility finding should be affirmed.

## II.    Medical Evidence of Record

### A.    Medical Opinion of Former Primary Care Physician Dr. Pamela Wible

In weighing the medical evidence in the record, the Commissioner generally affords enhanced weight to treating doctors' opinions. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, where these opinions are well supported by diagnostic techniques and are not inconsistent with other medical evidence in the record, treating doctors' opinions are accorded controlling weight. *See id.* Where the ALJ does reject a treating doctor's opinion because it is contradicted by other medical evidence, the ALJ must provide specific and legitimate reasons for doing so. *See, e.g., Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). These reasons must be supported by substantial evidence in the record. *See Valentine*, 574 F.3d at 692.

Dr. Wible's April 19, 2010, letter explained that Perkins "suffers from fibromyalgia, bipolar disorder, insomnia and ADHD. She has been hospitalized in the past due to a psychotic break and is currently stabilized on her medications and without treatment her condition would be life threatening." Tr. 446. The ALJ accorded significant weight this opinion because it was "consistent with the conclusion . . . that the claimant's functioning is improved with medication." Tr. 21. The ALJ noted that the letter did "not specifically address the claimant's functional limitations, though I consider it as supportive of the claimant's assertion that she requires reduced mental demands and stressors to manage her physical and mental impairments." Tr. 21.

Perkins argues that the ALJ rejected Dr. Wible's opinion and came to an "illogical" RFC assessment because he "misunderstood Dr. Wible's statement." Pl.'s Opening Br. 14-15.  Perkins asserts that the "only plausible reading of Dr. Wible's opinion" is that Perkins's condition had improved from life-threatening to not life-threatening, but her condition had not "remarkably improved by medication, so much so that she can work a full-time job." Pl.'s Opening Br. 15.

Notwithstanding Perkins's contrary assertion, I find that the ALJ did not in fact reject Dr. Wible's opinion.  The ALJ accepted Dr. Wible's opinion as consistent with other medical evidence of record and accorded it significant weight, rationally interpreting Dr. Wible's statement that Perkins was "currently stabilized on medication," Tr. 446, as supporting the conclusion that Perkins's condition had "improved with medication," Tr. 21.  Perkins offers an alternative plausible interpretation of Dr. Wible's letter: Perkins's conditions are no longer life-threatening but still inhibit her from engaging in full-time employment.  To the extent that Dr. Wible's letter may be interpreted as ambiguous, "[t]he ALJ . . . is responsible for resolving ambiguities.  We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Magallanes*, 881 F.2d at 750 (internal citations omitted).  Because the ALJ's interpretation of Dr. Wible's letter was rational, it is immaterial that Perkins offers an alternative explanation.  Furthermore, the ALJ found this letter actually to be supportive of Perkins's own claims that she required a low stress work environment and incorporated this limitation into his RFC assessment by excusing Perkins's from performing tasks where she would be expected to "stay[] focused for long periods," Tr. 18, or working in environments where she would be "in close proximity to a large group of people,"[12] Tr. 18.

---

[12]  While Perkins apparently equates the number of hours she works each week with her level of stress, Tr. 78, the ALJ is not required to accept this claim as true.  The ALJ is permitted to arrive

Perkins's argument fails because the ALJ did not reject Dr. Wible's opinion nor interpret it irrationally. The court therefore has no grounds to disturb the Commissioner's final decision based upon this assignment of error.

### B.    Medical Opinion of Examining Psychologists

As with treating doctors' medical opinions, examining doctors' opinions are entitled to great deference. Absent contradictory medical evidence, examining doctors' opinions can only be discredited for clear and convincing reasons supported by substantial evidence in the record. *Holohan,* 246 F.3d at 1202, *citing Reddick,* 157 F.3d at 725. "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison,* 2014 WL 3397218, at *14, *quoting Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight ... even if it does not meet the test for controlling weight.'" *Id.*, *quoting Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007).

### a.    Dr. Matthew Fleischman's Opinion

Dr. Fleischman performed a psychological evaluation on Perkins on July 1, 2009. Tr. 350. He observed that Perkins "has had problems with daydreaming, staying on task, being organized, her mind wandering, getting bored, rarely being 'present' and rarely finishing what she is doing." Tr. 351. Dr. Fleischman diagnosed Perkins with ADHD, anxiety disorder, depression, insomnia, and a pain disorder, and assigned her a GAF score of fifty. Tr. 355. As noted above, Dr. Fleischman described numerous treatment options based upon Perkins's disabilities, and recommended that Perkins consult with her mental health counselor about these options. The

---

at any rational interpretation of the evidence presented in the administrative record. *See Magallanes*, 881 F.2d at 750.

ALJ assigned significant weight to Dr. Fleischman's opinion that Perkins's condition could be "significantly improved" through one or more of his recommended treatment options, including increasing her activity level. Tr. 20, 356. The ALJ also reasoned that Dr. Fleishman believed that Perkins was capable of working because he "declined to endorse the conclusion that the claimant's mental symptoms rendered her incapable of any work activities." Tr. 20.

Perkins contends that the ALJ "reject[ed] or . . . diluted" Dr. Fleishman's opinion despite purportedly according it significant weight. Pl.'s Opening Br. 12. Perkins asserts that Dr. Fleischman's evaluation was conducted "for the purpose of securing treatment recommendations," not for the purpose of determining Perkins's capacity to work full-time, Pl.'s Opening Br. 12, but nevertheless supports the proposition that Perkins could not sustain full-time work, Pl.'s Opening Br. 13. According to Perkins, because Dr. Fleischman was not asked directly to opine whether Perkins had the capacity for full-time work, the ALJ erred in finding that "Dr. Fleishman declined to endorse the conclusion that [Perkins was] incapable of any work activities." Tr. 20.

Perkins further argues that the ALJ should not have considered Dr. Fleischman's opinion that treatment "could potentially cause the claimant's mental symptoms to be 'significantly improved.'" Tr. 356. Perkins reasons that it was inappropriate for the ALJ to use evidence suggestive of Perkins's potential to improve with treatment to conclude that Perkins was capable of performing full-time work. Pl.'s Opening Br. 12. In Perkins's opinion, the ALJ should have instead relied on Perkins's GAF score, which "suggest[ed] the claimant had serious problems with social or occupational functioning." Tr. 20. Perkins claims that her "GAF assessment of 50[] indirectly answers [in the negative] the question of whether Plaintiff can work full-time." Pl.'s Opening Br. 13.

Page 26 – FINDINGS AND RECOMMENDATION

The Commissioner responds that "[i]mpairments that can be controlled effectively with treatment are not disabling." Def.'s Br. 8. The Commissioner claims that the ALJ's reliance on Dr. Fleischman's opinion as evidence that Perkins's symptoms could be controlled effectively through treatment was a rational interpretation of that evidence, the reasonableness of which is not negated or diminished by Perkins's alternative interpretation. Def.'s Br. 9. The Commissioner further argues that the ALJ did not err by considering, but not relying on, Perkins's GAF score in reaching his RFC determination. According to the Commissioner, a claimant's GAF score may be suggestive of her level of functioning, but it is not dispositive of a finding of disability under the Act. Def.'s Br. 10. Lastly, the Commissioner claims that Perkins has failed in her burden to show that any error the ALJ made with regard to his treatment of Dr. Fleischman's opinion was harmful because "she has identified no specific functional limitations described by Dr. Fleischman that the ALJ failed to include in the RFC." Def.'s Br. 10.

Perkins is correct that the ALJ erred in his treatment of Dr. Fleischman's opinion. As with Dr. Wible's opinion, Dr. Fleischman did not address Perkins's capacity to engage in full-time work. The ALJ therefore should not have equated Dr. Fleischman's silence on the question of whether Perkins' could work with an endorsement that she was not incapable of working. However, this error was harmless and provides no grounds to reverse the Commissioner's decision. The ALJ accorded significant weight to Dr. Fleischman's opinion only to the extent that it supported the conclusion that Perkins's impairments were treatable.[13] Tr. 20. While the ALJ twice noted that Dr. Fleischman did not opine that Perkins could not work, other evidence in

---

[13] The ALJ's use of Dr. Fleischman's opinion for this purpose was legitimate. *See Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). This finding was also supported by Dr. Walker's September 16, 2009, treatment notes, which indicated that Perkins's mood improved when she was taking her medication, but she "began to experience apathy, low energy, and lack of interest after stopping her medication." Tr. 20, 363.

the record supports this conclusion. Tr. 20. As discussed below, the ALJ accorded significant weight to Dr. Scott's opinion that Perkins could perform basic work activities, Tr. 20, and great weight to the opinions of the state agency psychological consultants, who opined that Perkins could engage in full-time work, Tr. 21. Even excluding his erroneous interpretation of Dr. Fleischman's opinion, the ALJ's finding that Perkins was "not incapable of any work activities," Tr. 20, was supported by substantial evidence in the record. Because this error was inconsequential to the ALJ's non-disability finding, it was harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *quoting Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (affirming "the general principle that an ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.' In other words, in each case we look at the record as a whole to determine whether the error alters the outcome of the case.") (internal citations omitted).

Furthermore, Perkins's GAF score does not, as a matter of law, substantiate that she was disabled under the Act. "The GAF scale. . . does not have a direct correlation to the severity requirements in [the Act's] mental disorders listings." 65 Fed .Reg. 50746-01, at * 50764-50765 (Aug. 21, 2000). "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "Although GAF scores . . . do not control determinations of whether a person's mental impairments rise to the level of a disability . . . they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects." *Garrison*, 2014 WL 3397218, at *4 n.4. The ALJ acknowledged that Perkins's GAF score "suggested the claimant had serious problems with social or occupational functioning," T. 20, but

Page 28 – FINDINGS AND RECOMMENDATION

found this less persuasive than the evidence suggesting that numerous potential treatment options were then available to Perkins and that she had been responsive to treatment in the past, Tr. 20. As discussed above, the finding that Perkins's conditions were treatable was supported by substantial evidence of record. Because this finding was supported by substantial evidence and it was rational for the ALJ to consider the treatment evidence more probative to his non-disability finding than Perkins's GAF score, the court should not disturb the ALJ's conclusions in consequence of the ALJ's erroneous treatment of Dr. Fleischman's opinion. *See Magallanes*, 881 F.2d at 750.

### b.    Dr. Ryan Scott's Opinion

On April 5, 2010, Dr. Scott conducted a psychodiagnostic evaluation of Perkins. Tr. 431. As noted above, based upon his clinical assessment, Dr. Scott opined that Perkins appeared to meet the criteria for bipolar disorder with psychotic features and ADHD. Tr. 435. He further opined that Perkins's "bipolar disorder and ADHD have caused significant impairment in her ability to do work tasks in the past and maintain steady employment. Her psychological issues would likely be a significant distractor to those around her and substantially interfere with her ability to complete work tasks in a timely manner."[14] Tr. 435. However, in Dr. Scott's opinion, Perkins's "[m]ental status testing suggests that she would have the cognitive abilities to perform work tasks if not impaired by physical or mental health issues." Tr. 435. The ALJ accorded significant weight to Dr. Scott's opinion "to the extent it supports the conclusion that the claimant can perform at least some basic work activities, provided they accommodate her problems with

---

[14]  In his opinion, the ALJ misquoted Dr. Scott's treatment notes, writing: "Dr. Scott reported that the claimant's mental disorders 'have caused significant impairment in her ability to do work tasks and maintain steady employment.'" Tr. 20. As indicated above, Dr. Scott actually wrote that Perkins's mental disorders "have caused significant impairment in her ability to do work tasks *in the past* and maintain steady employment." Tr. 435 (emphasis added).

concentration and appropriate social interaction." Tr. 20. As previously discussed, the ALJ's

RFC assessment included limitations on Perkins's ability to persist on lengthy tasks and work in

close proximity to large groups of people. Tr. 22.

Perkins argues, again, that the ALJ purported to accord weight to medical evidence that

he in effect discredited. Specifically, Perkins alleges that despite crediting Dr. Scott's opinion,

the ALJ did not sufficiently account for Dr. Scott's written statements that Perkins was unable to

complete tasks in a timely manner or maintain steady employment.[15] Pl.'s Opening Br. 11. As to

Perkins's first assertion, the ALJ expressly incorporated into his RFC assessment Dr. Scott's

opinion that Perkins was unable to timely complete tasks. The ALJ found that Perkins's ability

to perform light work was limited by her "difficulty staying focused for long periods on tasks."

Tr. 18. The inability to focus on tasks precludes the ability to complete tasks on time. On its

face, this limitation is consistent with and sufficiently accounts for Dr. Scott's opinion.

Perkins's second assertion fails as well. Dr. Scott's opinion that Perkins's conditions

"have caused significant impairment in her ability to . . . maintain steady employment" was an

opinion on the ultimate issue of whether Perkins was disabled. The determination of whether a

claimant is disabled to such an extent that she cannot be gainfully employed is a decision

reserved for the ALJ. *See* 20 C.F.R.§ 404.1527(e)(l). "'[T]he administrative law judge is not

bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of

disability, but he cannot reject them without presenting clear and convincing reasons for doing

so." *Reddick,* 157 F.3d at 725, *quoting Matthews v. Shalala,* 10 F.3d 678, 680 (9th Cir. 1993).

Where the medical expert's opinion is contradicted, it "can be rejected only with specific and

---

[15] Perkins concedes that the ALJ's RFC assessment sufficiently accounted for Dr. Scott's
opinions that Perkins had significant impairment in her ability to do work tasks and would be a
significant distractor to those around her. Pl.'s Opening Br. 10.

legitimate reasons supported by substantial evidence in the record." *Id., citing Lester*, 81 F.3d at 830. Here, as previously discussed in connection with Dr. Wible's letter and Dr. Fleischman's opinion, the ALJ's finding that Perkins's impairments were responsive to treatment contradicts Dr. Scott's opinion that Perkins was unable to work. Because the ALJ's finding was supported by a substantial corpus of specific and legitimate evidence in the record, the ALJ was not bound by Dr. Scott's opinion as to whether Perkins was too impaired to work.

To the extent that Dr. Scott's report of impairment on Perkins's ability to do work tasks can be construed as offering opinion other than as to the ultimate issue of disability, it stands merely for the proposition that Perkins was unsuccessful in her previous attempts at sustained employment.[16] If this interpretation is applied, this part of Dr. Scott's statement was simply a statement of fact based on Dr. Scott's understanding of Perkins's work history. It did not address Perkins's functional limitations and was therefore appropriately omitted from the RFC determination.

Under either interpretation of Dr. Scott's statement, this court has no grounds to disturb the ALJ's treatment of Dr. Scott's opinion.

### C.    "Other Source" Opinion of Dr. Nancy Colfer

The ALJ must consider all evidence supportive of a claimant's pain and symptom allegations, including the medical opinions of "other" medical sources. *See* 20 C.F.R. §§ 404.1527(d)(1); 404.927(c)(3). Chiropractors are treated as such as source. *See* 20 C.F.R. § 404.1527(d)(1). Failure to consider the opinion of a treating chiropractor therefore constitutes

---

[16]  This interpretation is derived from a literal reading of Dr. Scott's full statement that Perkins's mental disorders "have caused significant impairment in her ability to do work tasks *in the past*." Tr. 435 (emphasis added).

error. "Where an ALJ does not explicitly reject a medical opinion or set·forth specific, legitimate

reasons for crediting one medical opinion over another, he errs. . . . In other words, an ALJ errs

when he rejects a medical opinion . . . while doing nothing more than ignoring it." *Garrison*,

2014 WL 3397218, at *14.

However, this error is harmless where (1) the ALJ's ultimate non-disability determination

remains supported despite the error or (2) the ALJ has elsewhere in the decision provided

sufficient reasons for rejecting similar testimony. *See Carmickle*, 533 F.3d at 1162 ("[T]he

relevant inquiry . . . is not whether the ALJ would have made a different decision absent any

error, it is whether the ALJ's decision remains legally valid, despite such error.") (internal

citation omitted); *Molina*, 674 F.3d at 1121 (explaining error is harmless where the ALJ has

"already provided germane reasons for rejecting similar testimony").

> Although [the Ninth Circuit has] expressed different formulations of the harmless
> error rule depending on the facts of the case and the error at issue, we have
> adhered to the general principle that an ALJ's error is harmless where it is
> "'inconsequential to the ultimate nondisability determination." In other words, in
> each case we look at the record as a whole to determine whether the error alters
> the outcome of the case.

*Id.* at 1115 (internal citations omitted). Accordingly, an "ALJ's failure to expressly reject any

facially material . . . testimony is [not] per se prejudicial [because this] would run afoul with our

settled rule that we will not reverse errors that are 'inconsequential to the ultimate nondisability

determination.'" *Id.* at 1117, *quoting Carmickle*, 533 F.3d at 1162. Instead, "the long-settled rule

[is] that [the court] will not set aside the denial of a disability claim unless 'the Secretary's

findings are not supported by substantial evidence *in the record as a whole*.'" *Id.* at 1121,

*quoting Stone v. Heckler*, 761 F.2d 530, 531 (9th Cir. 1985).

> [I]f an ALJ has provided well-supported grounds for rejecting testimony
> regarding specified limitations, we cannot ignore the ALJ's reasoning and reverse
> the agency merely because the ALJ did not expressly discredit each witness who

> described the same limitations. Further, where the ALJ rejects a witness's
> testimony without providing germane reasons, but has already provided germane
> reasons for rejecting similar testimony, we cannot reverse the agency merely
> because the ALJ did not "clearly link his determination to those reasons."

*Id.*, quoting *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). This is a "'highly deferential

standard' that requires [the court] to affirm the ALJ's decision if supported by 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id., quoting*

*Valentine*, 574 F.3d at 690. The court, however, must be careful "not [to] uphold an agency's

decision on a ground not actually relied upon by the agency," *Id.* at 1104, *citing SEC*, 332 U.S. at

196.

    In contrast, where the ALJ silently rejects uncontroverted testimony supportive of the

claimant's impairment allegations that is of consequence to the disability determination, the ALJ

has committed harmful error. *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055-

1056 (9th Cir. 2006), *see also Carmickle*, 533 F.3d at 1162-1163 (explaining that *Stout* applies

where "the ALJ failed to provide any reasons for rejecting the evidence at issue[, and

consequently t]here [i]s simply nothing in the record for the court to review to determine whether

the ALJ's decision was adequately supported").

    The ALJ failed to discuss Dr. Colfer's proffered medical opinion. As Perkins's

chiropractor for more than two years from October 2007 through February 2010, Dr. Colfer's

opinion qualified as an "other source" medical opinion that the ALJ was required to consider.

*See* 20 C.F.R. §§ 404.1527(d)(1); 404.927(c)(3); 404.1527(d)(1). As noted above, in a letter

dated March 5, 2010, Dr. Colfer opined that "Perkins['s] health issues make it difficult for her to

reliably predict her function level from day to day, and therefore to maintain employment." Tr.

395. But the ALJ's decision does not discuss Dr. Colfer's opinion or make any reference to the

more than two years of chiropractic treatment Perkins received.

Perkins argues that the ALJ's silent rejection of Dr. Colfer's opinion was harmful error because the ALJ "did not consider the factors spelled out in SSR 06-3p in evaluating Dr. Coifer's [sic] opinion that Plaintiff could not reliably predict her function level from day to day." Pl.'s Opening Br. 14.  Perkins further asserts that "[Dr.] Coifer's [sic] opinion verifies Dr. Scott's and Dr. Fleischman's opinions" and, "[i]f credited, Dr. Coifer's [sic] opinion could have made a difference in the ALJ's disability determination."  Pl.'s Opening Br. 14.

The Commissioner does not dispute that the ALJ erred in failing to consider Dr. Colfer's opinion, but responds that this error was harmless because Dr. Colfer's opinion was contradicted by the opinion of Dr. Perry, who provided "more reliable medical evidence that the ALJ credited."  Def. Br. 13.  As described above, Dr. Perry performed a physical examination of Perkins on April 5, 2010, opining that Perkins's impairments limited her ability to stand or walk for more than six hours and to lift more than ten pounds on a regular basis, among other limitations.  The ALJ accorded significant weight to Dr. Perry's assessment, finding that it was "consistent with the assessment of the State agency medical consultants."[17]  Tr. 21.

Dr. Perry's opinion directly contradicted the opinion offered by Dr. Colfer as to Perkins's physical limitations.  While Dr. Colfer opined that on some days Perkins's fibromyalgia pain was fully debilitating and on other days she could, for example, sit, stand, walk, and lift without excessive pain, Dr. Perry did not find that Perkins's physical limitations fluctuated this drastically and opined that Perkins's functional limitations could be mitigated provided she was limited to light work with appropriate workplace accommodations.

---

[17]  The ALJ rejected Dr. Perry's opinion that Perkins's ability to reach was occasionally limited, finding that no medical evidence supported this opinion and it was inconsistent with Perkins's work as a yoga instructor.  He also rejected Dr. Perry's opinion that Perkins's capacity to sit was unlimited.  Tr. 21.

Page 34 – FINDINGS AND RECOMMENDATION

The ALJ committed error by not discussing, and thus not explicitly rejecting, Dr. Colfer's proffered opinion. But this error was harmless under the standard articulated in *Molina*.[18] *See Molina*, 674 F.3d at 1115, 1121. The ALJ's error was inconsequential to his ultimate non-disability finding and, as discussed above, the ALJ properly discredited Perkins's testimony to the extent that Perkins, like Dr. Colfer, alleged that her fluctuating physical pain prevented her from gainful employment.

The ALJ sufficiently explained his reasons for according significant weight to Dr. Perry's opinion. The ALJ found that Dr. Perry's opinion was consistent with the opinions of the state agency medical consultants. And, as the ALJ noted, the results of Dr. Perry's examination indicated that Perkins could "ambulate without an assistive device," "demonstrated normal motor strength in all extremities," and had "no observed deficits in her coordination or fine/gross motor skills." Tr. 21. Furthermore, Dr. Perry observed that Perkins was able to "sit[] comfortably during the examination" and "did not have difficulty getting on or off the examination table." Tr. 21. Because Dr. Colfer's opinion that Perkins could not maintain full-time employment was incompatible with the ALJ's rational interpretation of Dr. Perry's opinion – that Perkins's functional limitations were minimal and could be mitigated with appropriate accommodations – the ALJ's explicit acceptance of Dr. Perry's opinion was an implicit rejection of Dr. Colfer's opinion. The ALJ could not have accorded significant weight to Dr. Perry's opinion and have simultaneously accorded weight to Dr. Colfer's opinion that Perkins could not work full-time. In

---

[18] The court properly applies the harmless error standard articulated in *Molina*. *See Molina*, 674 F.3d 1104. Perkins argues that *Stout* applies, but this is incorrect because Dr. Colfer's opinion was directly contradicted by Dr. Perry's opinion and identified alleged limitations similar to those the ALJ rejected based on Perkins's hearing testimony. *See Stout*, 454 F.3d 1050. In *Molina*, the court limited the application of *Stout* to cases where silently rejected testimony "identified limitations not considered by the ALJ, was uncontradicted by anything in the record, and was highly probative of [plaintiff's] inability to work." *Molina*, 674 F.3d at 1116.

Page 35 – FINDINGS AND RECOMMENDATION

consequence, the ALJ's failure to discuss Dr. Colfer's opinion in his decision had no bearing on his ultimate non-disability finding.[19]

In addition, the ALJ properly discredited testimony of alleged limitations similar those identified in Dr. Colfer's opinion. Specifically, the ALJ rejected Perkins's testimony that her fluctuating physical pain prevented her from maintaining full-time employment. This testimony was substantially similar to Dr. Colfer's opinion that "Perkins['s] health issues make it difficult for her to reliably predict her function level from day to day, and therefore to maintain employment." Tr. 395. Where the ALJ has "provided germane reasons for rejecting similar testimony" elsewhere in the decision, the ALJ commits harmless error by silently rejecting medical evidence in the record. *Molina*, 674 F.3d at 1104.

As noted above, the ALJ discredited Perkins's physical pain and limitations testimony because it was contradicted by the opinions of Dr. Wible (Perkins's "fibromyalgia pain was controlled after 'dietary and lifestyle changes,'" Tr. 19, *quoting* Tr. 390) and Dr. Perry, Tr. 21, as well as Perkins's work as a yoga instructor, Tr. 15.

Accordingly, the ALJ's erroneous silent rejection of Dr. Colfer's other source opinion was harmless. It was inconsequential to the ALJ's ultimate decision that Perkins was not disabled and the ALJ properly discredited similar testimony as to the effects of Perkins's physical impairments. *See Molina*, 674 F.3d at 1115, 1121.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision in

---

[19]  Moreover, the opinions of Drs. Scott or Fleischman do not contradict the ALJ's decision as to Perkins's physical limitations or support Dr. Colfer's opinion, as Perkins argues. Dr. Scott expressly stated that he did not evaluate Perkins's fibromyalgia pain. Similarly, Dr. Fleischman's evaluation was limited in scope to Perkins's mental impairments. Thus neither doctor's opinion addressed Perkins's claimed physical limitations – the basis of Dr. Colfer's opinion.

connection with Perkins's applications for DIB and SSI benefits be affirmed.  Perkins's request

that she be granted a direct award of benefits should accordingly be denied.  A final judgment

should be prepared.

## SCHEDULING ORDER

The Findings and Recommendations will be referred to a district judge.  Objections, if

any, are due fourteen (14) days from service of the Findings and Recommendation.  If no

objections are filed, then the Findings and Recommendation will go under advisement on that

date.

If objections are filed, then a response is due fourteen (14) days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

DATED this 15th day of August, 2014.

Paul Papak
United States Magistrate Judge